**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

A. T. MASSEY COAL COMPANY, INC.;
MASSEY COAL SERVICES,
INCORPORATED; PEERLESS EAGLE COAL
COMPANY; TENNESSEE CONSOLIDATED
COAL COMPANY; RAWL SALES AND
PROCESSING COMPANY; OMAR MINING
COMPANY; PM CHARLES COAL
COMPANY; ROCKY HOLLOW COAL CO;
SPROUSE CREEK PROCESSING
COMPANY; BIG BEAR MINING
COMPANY; DEHUE COAL COMPANY;
DOUGLAS POCAHONTAS COAL
CORPORATION; HOPKINS CREEK COAL;
JOBONER COAL COMPANY; MAJESTIC
MINING, INCORPORATED; PERFORMANCE
COAL COMPANY; VANTAGE MINING
COMPANY; RUSSELL FORK COAL
COMPANY; VESTA MINING COMPANY,
     *Plaintiffs and Counterclaim*
         *Defendants-Appellants,*

     and

BELFRY COAL CORPORATION,
         *Plaintiff,*

     v.

LARRY G. MASSANARI, ACTING
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION; MICHAEL H.
HOLLAND; WILLIAM P. HOBGOOD;

No. 01-2155

MARTY D. HUDSON; THOMAS O. S.
RAND; ELLIOTT A. SEGAL; CARL E.
VAN HORN; GAIL R. WILENSKY,
Trustees of the United Mine
Workers of America Combined
Benefit Fund; UNITED MINE
WORKERS OF AMERICA COMBINED
BENEFIT FUND,
                    *Defendants-Appellees,*

                 and

TRACE FORK COAL COMPANY; GOALS
COAL COMPANY; GREEN VALLEY
COAL COMPANY; LICK BRANCH COAL
COMPANY; EAGLE ENERGY,
INCORPORATED; POWER MOUNTAIN
COAL COMPANY; WILLIAMS MOUNTAIN
COAL COMPANY,
                         *Defendants.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, District Judge.
(CA-99-83)

Argued: April 3, 2002

Decided: September 18, 2002

Before NIEMEYER, KING, and GREGORY, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in
which Judge Gregory joined. Judge Niemeyer wrote an opinion con-
curring in part in the judgment and dissenting in part.

**COUNSEL**

**ARGUED:** John Ray Woodrum, HEENAN, ALTHEN & ROLES, L.L.P., Washington, D.C., for Appellants. Peter Buscemi, MORGAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C.; Sharon Swingle, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Margaret S. Lopez, HEENAN, ALTHEN & ROLES, L.L.P., Washington, D.C.; John M. Poma, A.T. MASSEY COAL COMPANY, INC., Richmond, Virginia, for Appellants. Stanley F. Lechner, Charles P. Groppe, MORGAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C.; Samuel M. Brock, III, TROUTMAN, SANDERS, MAYS & VALENTINE, Richmond, Virginia; John R. Mooney, Marilyn A. Baker, MOONEY, GREEN, BAKER & SAINDON, P.C., Washington, D.C.; David W. Allen, Office of the General Counsel, UMWA HEALTH AND RETIREMENT FUNDS, Washington, D.C., for Appellees Trustees. Robert D. McCallum, Jr., Assistant Attorney General, Paul J. McNulty, United States Attorney, Mark B. Stern, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees.

---

**OPINION**

KING, Circuit Judge:

A.T. Massey Coal Company, Massey Coal Services, Peerless Eagle Coal Company, and Tennessee Consolidated Coal Company (the "Massey Plaintiffs") appeal the decision of the district court that rendered them liable for the benefits of certain beneficiaries under the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701-9722 (the "Coal Act" or the "Act"). The Massey Plaintiffs maintain that their assignments of liability are unconstitutional under the Supreme Court's decision in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), and they assert that the assignments also violate the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (the "APA"). For the reasons explained below, we conclude that these contentions are without merit, and we affirm the district court.

I.

   This proceeding arises from the efforts of Congress to alleviate a crisis in the funding of retiree health benefits that engulfed the coal industry in the late 1980s. In the wake of spiraling health care costs and declining numbers of coal operators, Congress enacted the Coal Act in 1992 to ensure that retired coal miners and their dependents (the "Beneficiaries") would receive death benefits and adequate health care (the "Benefits"). In order to pay for the Benefits, the Act established a multiemployer benefit plan known as the United Mine Workers of America Combined Benefit Fund (the "Combined Fund"). The Combined Fund is financed by annual premiums assessed against current and former coal operators. It utilizes a complex administrative process to assign liability for Benefits to the operator most clearly connected to a coal miner's employment in the coal industry. The Act places the responsibility for administering this assignment process with the Commissioner of Social Security (the "Commissioner"), and it places the responsibility for administering the Combined Fund with the Fund's Trustees. Pursuant to his statutory authority, the Commissioner made multiple assignments of liability. Among those assignments were several made to the Massey Plaintiffs, including the assignments at issue in this appeal.

   Certain entities challenged the efforts of the Commissioner and the Combined Fund to impose liability on them for Benefits due under the Coal Act. In 1998, the Supreme Court overturned the Commissioner's assignments of liability to one former operator, Eastern Enterprises ("Eastern"). *Eastern Enters. v. Apfel*, 524 U.S. 498 (1998). The Court, however, was unable to agree upon the rationale for its ruling: a four-justice plurality voted to invalidate the assignments on one constitutional theory, while Justice Kennedy voted to invalidate the assignments on an alternate constitutional basis.

   Following the decision in *Eastern Enterprises*, the Commissioner voided several assignments to coal operators that he deemed to be similarly situated to Eastern. The Commissioner did not find the Massey Plaintiffs to be similarly situated, however, and he declined to void the assignments he had earlier made to them. The Massey Plaintiffs then formally requested that certain of their assignments (the

"Massey Assignments") be voided, but the Commissioner denied their requests.

In January 1999, the Massey Plaintiffs initiated this suit in the Eastern District of Virginia against the Commissioner, the Combined Fund, and the Fund's Trustees. They contended that the Massey Assignments violate the Takings and Due Process Clauses of the Fifth Amendment, as well as certain provisions of the APA. On cross-motions for summary judgment, the district court, on July 19, 2001, ruled in favor of the defendants, concluding that the Massey Assignments did not contravene the Court's holding in *Eastern Enterprises*. *A.T. Massey Coal Co., Inc. v. Massanari*, 153 F. Supp. 2d 813 (E.D. Va. 2001).

## II.

The events leading to the enactment of the Coal Act have been well chronicled by this and several other courts. *See generally Eastern Enters. v. Apfel*, 524 U.S. 498, 504-16 (1998); *Sigmon Coal Co., Inc. v. Apfel*, 226 F.3d 291, 294-96 (4th Cir. 2000), *aff'd sub nom. Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438 (2002); *Holland v. Big River Minerals Corp.*, 181 F.3d 597, 600-02 (4th Cir. 1999); *Anker Energy Corp. v. Consolidation Coal Co.*, 177 F.3d 161, 164-65 (3d Cir. 1999); *Carbon Fuel Co. v. USX Corp.*, 100 F.3d 1124, 1127-28 (4th Cir. 1996). We therefore only briefly summarize the Act's history.

## A.

In 1946, the United Mine Workers of America (the "UMWA") staged a nationwide strike in an effort to secure better health and retirement benefits for its membership. In response, President Truman nationalized the coal mines, and his Secretary of the Interior entered into negotiations with UMWA President John L. Lewis. These negotiations culminated in the historic Krug-Lewis Agreement, which ended the strike and led to the creation of benefit trusts. These benefit trusts were financed by coal production royalties and by payroll deductions. They provided death, disability, retirement, and health benefits for coal miners and their dependents.

Shortly after the Krug-Lewis Agreement, the coal mines were returned to private control, and the UMWA and a multiemployer group of coal operators entered into the National Bituminous Coal Wage Agreement of 1947 (the "1947 NBCWA"). The 1947 NBCWA established the United Mine Workers of America Welfare and Retirement Fund (the "1947 Fund"), which was modeled on the Krug-Lewis benefit trusts. The 1947 Fund was financed exclusively by royalties from coal production, and it provided both pension and health benefits to coal miners and their dependents. The 1947 NBCWA failed to guarantee coal miners any specific benefits, leaving the determination of benefit levels to three trustees of the 1947 Fund.

The acrimony between the UMWA and the coal operators over benefits persisted, however, and in 1950 the UMWA and the coal operators executed a new agreement (the "1950 NBCWA"). The 1950 NBCWA replaced the 1947 Fund with a new fund financed by a per-ton royalty on coal production (the "1950 Fund"). The 1950 Fund mirrored the 1947 Fund in that it failed to guarantee coal miners any vested benefits, instead leaving the power to adjust or even terminate benefits with the Fund's trustees. Like its predecessor, the 1950 Fund operated on a pay-as-you-go basis, with the trustees adjusting benefit levels to fit budgetary constraints. As such, the 1950 NBCWA provided no guarantee of lifetime benefits to miners.

Although the 1950 NBCWA was amended several times, its structure remained essentially unchanged until 1974. A combination of demographic trends, which had increased the cost of benefits, and the passage of the Employee Retirement Income Security Act ("ERISA"), led in 1974 to the replacement of the 1950 Fund. The UMWA and the Bituminous Coal Operators' Association ("BCOA") entered into a new agreement, the 1974 NBCWA. This agreement replaced the 1950 Fund with four new trusts, financed by a combination of coal production royalties and premiums based on hours worked by coal miners.[1] Two of these new trusts, the UMWA 1950 Benefit Plan and Trust (the "1950 Benefit Plan") and the UMWA 1974 Benefit Plan and Trust

---

[1]In 1951, a large number of coal operators organized themselves into the BCOA, which became the primary representative of coal operators in negotiations with the UMWA.

(the "1974 Benefit Plan"), provided health benefits for miners.[2] The 1950 Benefit Plan covered coal miners who were already retired, or who retired prior to January 1, 1976, as well as their dependents, while the 1974 Benefit Plan covered coal miners who retired on or after January 1, 1976, as well as their dependents.

The 1974 NBCWA constituted a significant break from the past in that it was the first agreement between the UMWA and the BCOA to provide lifetime health benefits for retirees and their widows (unless a widow remarried). As such, the 1974 NBCWA vastly expanded benefit costs. That increase in payable benefits, combined with other factors (e.g., a decline in coal production, a rise in miner retirements, and the growth of health care costs) caused the 1950 and 1974 Benefit Plans to encounter financial problems. These problems led to the creation of the 1978 NBCWA, which rendered each employer who signed the agreement individually responsible for providing health care benefits for its own active and retired employees. The 1950 and 1974 Benefit Plans, which were to be financed by the coal operators who were party to the 1978 NBCWA, thereafter covered only "orphaned retirees," i.e., retired miners whose employers either had ceased coal mining operations or were no longer party to the NBCWAs.[3] The 1978 NBCWA represented a shift in coal operator liability from a "defined contribution" obligation, under which operators were responsible for the payment of production royalties, to a "defined benefit" obligation, under which such operators were obliged to provide sufficient monies to maintain specific benefits.

Despite the changes wrought by the 1978 NBCWA, the 1950 and 1974 Benefit Plans continued to encounter financial problems as costs increased and operators continued to leave the coal mining business. Although additional NBCWAs were agreed to and executed during the 1980s in attempts to address these financial difficulties, they failed to render the 1950 and 1974 Benefit Plans financially viable.

---

[2]The 1950 Benefit Plan and 1974 Benefit Plan did not cover pension benefits. The 1974 NBCWA established a separate funding plan for pensions.

[3]Put simply, orphaned retirees were miners whose employers had left the unionized coal mining industry, either because they no longer mined coal or because they had commenced non-union coal mining operations.

In 1989, the threat of insolvency in the 1950 and 1974 Benefit Plans led the UMWA to call a contentious and lengthy strike against the Pittston Coal Company, which was settled only after the Secretary of Labor intervened. As part of that settlement, the federal government formed the Advisory Commission on United Mine Workers of America Retiree Health Benefits. This Commission prepared a report that formulated multiple legislative solutions to the financial problems racking the 1950 and 1974 Benefit Plans, and its recommendations formed the basis for the Coal Act.

B.

Under the Coal Act, the 1950 and 1974 Benefit Plans were merged into the newly created Combined Fund.[4] 26 U.S.C. § 9702(a). The Combined Fund was designed to provide health and death benefits to certain miners and their dependents (i.e., the Beneficiaries) who, prior to July 20, 1992, had been receiving or were eligible to receive benefits under the 1950 and 1974 Benefit Plans.[5] 26 U.S.C. §§ 9703(a), (b), (c), & (f). The Combined Fund is financed by annual premiums assessed against "signatory operators," i.e., coal operators who have signed a coal wage agreement,[6] including those signatory operators who are no longer in the coal business. 26 U.S.C. §§ 9701(b)(1), (b)(3), & (c)(1). Those premiums are calculated on the basis of the number of eligible Beneficiaries assigned to a particular operator. 26 U.S.C. §§ 9703(f) & 9704. As we have noted, the responsibility for the assignment of Beneficiaries rests with the Commissioner of Social Security. 26 U.S.C. § 9706(a).[7]

---

[4]The Coal Act also established the 1992 UMWA Benefit Plan, which covers certain coal miners and their dependents who are not eligible for benefits from the Combined Fund. 26 U.S.C. § 9712(b). In addition, the Act mandates the continuation of the individual health plans maintained by signatory operators to the 1978 and subsequent NBCWAs. 26 U.S.C. § 9711. These provisions are not at issue in this appeal.

[5]As such, the Combined Fund provides Benefits only for retired miners who worked under an NBCWA and for those miners' eligible dependents.

[6]A coal wage agreement is either an NBCWA or another agreement that bound the operator to the terms of a prevailing NBCWA.

[7]The assignment provision of the Coal Act, found at § 9706(a) of Title 26, provides in relevant part as follows:

The Coal Act contemplates the possibility that, by engaging in creative corporate restructuring, a signatory operator might avoid its liability. *See* 138 Cong. Rec. S17604 (daily ed. Oct. 8, 1992) (Conference Committee Report). In order to preclude such avoidance, the Act designates certain closely related entities as "related persons," and it treats those entities for purposes of Combined Fund liability as though they were a single employer. *See* 26 U.S.C. § 9706(b)(1)(A). Furthermore, the Coal Act subjects related persons to joint and several liability for a signatory operator's premiums. 26 U.S.C. § 9704(a).

Under the Act, "[a] person shall be considered to be a related person to a signatory operator if that person is . . . a member of the controlled group of corporations . . . which includes such signatory operator; . . . [or] a successor in interest to any [such] person." 26 U.S.C. § 9701(c)(2). The Act spells out three types of corporate rela-

---

[T]he Commissioner of Social Security shall . . . assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or related person with respect to which) remains in business in the following order:

(1)  First, to the signatory operator which —

(A)  was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

(B)  was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least 2 years.

(2)  Second, if the retiree is not assigned under paragraph (1), to the signatory operator which —

(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry.

(3)  Third, if the retiree is not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement.

tionships that constitute a "controlled group of corporations." The relevant relationship for our purposes is known as a "parent-subsidiary controlled group." 26 U.S.C. § 1563(a)(1).[8] Whether a corporate entity is a "related person" to a signatory operator is determined by that entity's relationship to the signatory operator as of July 20, 1992. 26 U.S.C. § 9701(c)(2)(B).

Thus, under the "related person" provision of the Coal Act, corporations that have never signed an NBCWA, as well as those that have never taken part in the mining industry, may be liable for Benefits. In effect, the Coal Act treats the corporate family as a single employer for the purpose of assigning liability for Benefits. In fact, the Act specifically provides, in 26 U.S.C. § 9706(b)(1)(A), that "[a]ny employment of a coal industry retiree in the coal industry by a signatory operator shall be treated as employment by any related persons to such operator."

### C.

The lead plaintiff here, A.T. Massey Coal Company ("A.T. Massey") is the parent of several wholly owned corporate subsidiaries, including the other Massey Plaintiffs,[9] that are engaged in coal mining

---

[8]Section 1563(a)(1) of Title 26 defines the parent-subsidiary controlled group as follows:

(1)   *Parent-subsidiary controlled group.* — One or more chains of corporations are connected through stock ownership with a common parent corporation if —

(A)   stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of each of the corporations, except for the common parent corporation, is owned . . . by one or more of the other corporations; and

(B)   the common parent corporation owns . . . stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of at least one of the other corporations . . . .

[9]The other three Massey Plaintiffs are: Massey Coal Services, Inc. ("Massey Coal Services"), Peerless Eagle Coal Company ("Peerless Eagle"), and Tennessee Consolidated Coal Company ("Tennessee Consolidated").

operations. *See A.T. Massey Coal Co. v. Int'l Union, UMWA*, 799 F.2d 142, 144 (4th Cir. 1986) (observing that A.T. Massey and its affiliates function as "a single production entity with sales, transportation and distribution coordinated from Massey's Richmond headquarters"). The Massey Plaintiffs have stipulated that the Massey corporate family (the "Massey Group"), of which they are a part, constitutes a "controlled group of corporations" within the meaning of the Coal Act, and that the corporations within the Massey Group are therefore "related persons." Thus, each Massey Plaintiff is a "related person" with respect to each of the other three Plaintiffs, as well as to a host of other coal operators within the Massey Group, such as Omar Mining Company ("Omar Mining"), Sprouse Creek Processing Company ("Sprouse Creek"), and Big Bear Mining Company ("Big Bear").[10]

Pursuant to the assignment provisions of the Coal Act, specifically 26 U.S.C. § 9706(a)(3), the Commissioner made the Massey Assignments under challenge here. The Commissioner assigned A.T. Massey liability for eighty-two retired coal miners, based on its relationship as the parent of Ben Creek Coal Company ("Ben Creek") and Ben Creek's corporate predecessors (Merrill Coal Company, Gay Mining Company, and Massey Coal Mining Company). The Commissioner similarly assigned Massey Coal Services liability for two retired coal miners, based on its relationship to Ben Creek. Peerless Eagle was assigned liability for a total of forty-five retired coal miners who had worked for Peters Creek Coal Company, which merged with Peerless Eagle in 1962. Finally, the Commissioner assigned liability to Tennessee Consolidated for 204 retired coal miners that it had directly employed.[11]

---

[10]In addition to Omar Mining, Sprouse Creek, and Big Bear, other members of the Massey Group include appellants PM Charles Coal Company; Rocky Hollow Coal Company; Dehue Coal Company; Douglas Pocahontas Coal Corporation; Hopkins Creek Coal Company; Joboner Coal Company; Majestic Mining, Incorporated; Performance Coal Company; Vantage Mining Company; Russell Fork Coal Company; and Vesta Mining Company.

[11]In many instances, the Commissioner assigned liability to the Massey Plaintiffs for the Benefits of coal miners who were deceased when the Combined Fund began providing benefits in February 1993. In such

Among the Massey Plaintiffs, only Tennessee Consolidated has signed an NBCWA, last doing so in 1960. Other members of the Massey Group, however, signed the 1974 or subsequent NBCWAs, such as Omar Mining (which signed the 1974, 1978, 1981, and 1984 NBCWAs), Sprouse Creek (which signed the 1974, 1978, and 1981 NBCWAs), and Big Bear (which signed the 1978 and 1981 NBCWAs).

D.

After its enactment, the Coal Act was challenged in various judicial proceedings. Although many of these legal assaults were unsuccessful, a notable exception was a lawsuit brought by Eastern Enterprises ("Eastern") in the District of Massachusetts. In *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), the Supreme Court held that the Coal Act, as applied to Eastern, was unconstitutional.

Eastern was a coal operator that had been in the coal mining business from 1929 until 1965. It had signed every NBCWA between 1947 and 1964. In 1965, Eastern transferred its coal mining operations to a wholly owned subsidiary, Eastern Associated Coal Corporation ("EACC"), and it then withdrew from active involvement in the coal industry. EACC thereafter signed several subsequent NBCWAs, including the 1974, 1978, and 1988 agreements. In 1987, Eastern sold its interest in EACC, and it thereafter had no connection to the coal mining industry. After enactment of the Coal Act, the Commissioner, pursuant to 26 U.S.C. § 9706(a)(3), assigned liability to Eastern for over a thousand retired miners whom it had employed prior to its departure from the coal mining industry in 1965. These assignments made Eastern liable for payments to the Combined Fund of more than

_____

cases, no premiums were assessed against the Massey Plaintiffs; those assignments were made to demonstrate the basis on which a coal miner's eligible dependents were assigned to the Massey Plaintiffs. Moreover, the number of beneficiaries for whom premiums have been assessed has declined due to mortalities occurring since 1993. Thus, by 1999 — the most recent plan year for which the parties have provided data — A.T. Massey was responsible for 30 beneficiaries, Massey Coal Services for 2 beneficiaries, Peerless Eagle for 22 beneficiaries, and Tennessee Consolidated for 80 beneficiaries.

fifty million dollars. Eastern brought suit against the Commissioner, challenging these assignments and contending that they violated the Takings and Due Process Clauses of the Fifth Amendment.

Although a majority of the Court upheld Eastern's challenge to the assignments, the Court offered no unified rationale for its holding. Justice O'Connor, writing for herself, Chief Justice Rehnquist, and Justices Scalia and Thomas, concluded that the Coal Act's assignments of liability to Eastern represented an unconstitutional taking. *Eastern Enters.*, 524 U.S. at 537-38. This plurality of the Court observed that economic legislation may be unconstitutional if "it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience." *Id.* at 528-29. The plurality opinion observed that the Coal Act required Eastern to pay premiums to ensure that beneficiaries possessed benefits for life, and that such lifetime benefits were not part of any coal wage agreements prior to the 1974 NBCWA. *Id.* at 535. Because Eastern had left the coal mining business in 1965, the plurality concluded that the Act imposed "such a disproportionate and severely retroactive burden upon Eastern," that its assignments were unconstitutional under the Takings Clause. *Id.* at 536-38.

Justice Kennedy, who provided the fifth vote for invalidation of the Eastern assignments, explicitly rejected the plurality's Takings Clause analysis, and he instead concluded that the Coal Act, as applied to Eastern, violated the Due Process Clause. *Id.* at 546-50 (Kennedy, J., concurring in the judgment and dissenting in part). Justice Kennedy maintained that "retroactive laws of great severity" could contravene due process, and that such retroactive legislation is particularly problematic when it is not being used to remedy a past wrong. *Id.* at 549. He observed that the assignments to Eastern had a "retroactive effect of unprecedented scope," in that they reached back over thirty years. *Id.* According to Justice Kennedy, Eastern's departure from the coal mining industry prior to the 1974 NBCWA meant that it had played no role in the fiscal crisis that engulfed the industry in the 1970s and 1980s. *Id.* As such, he concluded that the Commissioner's assignments of liability to Eastern could in no way be viewed as a remedy

for Eastern's past conduct, and that the assignments thus contravened due process.[12] *Id.*

### E.

In the wake of the *Eastern Enterprises* decision, the Commissioner voided several assignments to coal operators that he deemed "similarly situated" to Eastern. He declined, however, to void the Massey Assignments, even though those assignments were for coal miners who had worked, prior to the 1974 NBCWA, for coal operators who had not signed the 1974 or any subsequent NBCWA. The Commissioner concluded that the Massey Assignments were proper because the Massey Plaintiffs are part of a "controlled group" of corporations, as defined in 26 U.S.C. § 1563(a)(1), that include several signatories to the 1974 NBCWA or subsequent NBCWAs.

In January 1999, the Massey Plaintiffs brought suit against the Commissioner, the Combined Fund, and the Fund's Trustees, contending that the Massey Assignments violated both the Constitution — specifically the Takings and Due Process Clauses of the Fifth Amendment — and the APA.[13] By their complaint, the Massey Plaintiffs sought a refund from the Combined Fund of the premiums they

---

[12]The four dissenting Justices, with Justice Breyer authoring the primary dissenting opinion, concluded that Eastern's assignments did not violate any Fifth Amendment guarantees. *Eastern Enters.*, 524 U.S. at 565-67 (Breyer, J., dissenting). Like Justice Kennedy, the dissenters expressly rejected the plurality's Takings Clause analysis. *Id.* at 554. Thus, the Court voted five-four that the Eastern assignments were not an unconstitutional taking. However, the four dissenters also expressly rejected Justice Kennedy's conclusion that the assignments violated due process. Hence, with the plurality declining to address that issue, only one Justice (Justice Kennedy) subscribed to the notion that the Eastern assignments violated due process. As a result, there was no single constitutional theory under which a majority of the Justices agreed that the Eastern assignments were unconstitutional.

[13]A fifth Massey company, Belfry Coal Corporation ("Belfry"), was also a plaintiff in the district court. On April 28, 2000, the Commissioner declared void the assignments challenged by Belfry. Belfry's claims against the Commissioner and the Combined Fund are therefore moot, and Belfry is not a party to this appeal.

had paid as a result of the Massey Assignments. In response, the Combined Fund and its Trustees filed counterclaims against the Massey Plaintiffs and other members of the Massey Group, i.e., other companies under the common ownership or control of A.T. Massey.[14] The counterclaimants sought a declaratory judgment that the Coal Act, as applied to the Massey Plaintiffs and the other counterclaim defendants, violates neither the Takings nor Due Process Clause; and they sought an injunction requiring the counterclaim defendants to pay the premiums due the Combined Fund under the Act.

By its opinion of July 19, 2001, the district court awarded summary judgment to the Commissioner, the Combined Fund, and the Fund's Trustees, concluding that the Massey Assignments did not contravene the Court's holding in *Eastern Enterprises*. *A.T. Massey Coal Co., Inc. v. Massanari*, 153 F. Supp. 2d 813 (E.D. Va. 2001). The district court, however, denied the counterclaims of the Combined Fund and its Trustees.[15] The Massey Plaintiffs and the other counterclaim defendants have appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

### III.

The parties agree that the material facts of this case are not in dispute. They also agree that this appeal involves only questions of law. Under controlling authority, we review the district court's award of summary judgment de novo. *Holland v. Pardee Coal Co.*, 269 F.3d 424, 430 (4th Cir. 2001).

---

[14]The Commissioner filed a separate answer to the complaint, and he did not assert any counterclaims.

[15]In light of the district court's decision, the parties entered into a stipulation, dated August 22, 2001, under which the Massey Plaintiffs agreed to pay all premiums assessed by the Combined Fund plus interest, while the Combined Fund agreed to issue an appropriate refund if the Massey Plaintiffs prevailed at a later date. The district court then amended its opinion to account for the stipulation. *A.T. Massey Coal Co., Inc. v. Massanari*, CA No. 3:99cv83, Order (E.D. Va. Aug. 28, 2001).

IV.

Although the Massey Plaintiffs assert that the Massey Assignments violate both the Constitution and the APA, their appeal turns on a single issue — whether those assignments are unconstitutional under *Eastern Enterprises*.[16] Before we can evaluate this question, however, we must first ascertain the holding of *Eastern Enterprises*.

A.

It is well established, under *Marks v. United States*, 430 U.S. 188 (1977), that when a decision of the Court lacks a majority opinion, the opinion of the Justices concurring in the judgment on the "narrowest grounds" is to be regarded as the Court's holding. 430 U.S. 188, 193 (1977). The *Marks* rule does not apply, however, unless "the narrowest opinion represents a 'common denominator of the Court's reasoning' and 'embod[ies] a position implicitly approved by at least five Justices who support the judgment.'" *Association of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1254 (D.C. Cir. 1998) (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991)). In *Eastern Enterprises*, Justice Kennedy specifically rejected the plurality opinion's reliance on Takings Clause jurisprudence, and he instead based his conclusion on a due process theory that the plurality expressly declined to address. *Compare Eastern Enters. v. Apfel*, 524 U.S. 498, 537-38 (1998) ("Because we have determined that the [Coal Act] violates the Takings Clause as applied to Eastern, we need not address Eastern's due process claim."), *with id.* at 539 (Kennedy, J., concurring in the judgment and dissenting in part) ("I concur in the judgment

---

[16]As a final agency decision, the Commissioner's assignment of beneficiaries is governed by the APA. *Sigmon Coal Co., Inc. v. Apfel*, 226 F.3d 291, 301 (4th Cir. 2000), *aff'd sub nom. Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438 (2002). Under § 706 of the APA, the Commissioner's decision may be set aside only if it was either "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "contrary to constitutional right, power, privilege, or immunity." In this case, the Massey Plaintiffs contend that the Massey Assignments must be set aside because those assignments are contrary to the Court's holding in *Eastern Enterprises*. Therefore, in deciding the constitutional issue, we also dispose of the Massey Plaintiffs' APA claim.

holding the Coal Act unconstitutional but disagree with the plurality's Takings Clause analysis, which, it is submitted, is incorrect."). Our analysis of the two opinions finds no theoretical overlap between the rationales employed by the plurality and Justice Kennedy; as such, "Justice Kennedy's substantive due process reasoning is not a 'narrower' ground that we might take to constitute the controlling holding." *Unity Real Estate Co. v. Hudson*, 178 F.3d 649, 658 (3d Cir. 1999); *see also Association of Bituminous Contractors*, 156 F.3d at 1254-55. Thus, consistent with the other courts that have analyzed this question, we conclude that *Eastern Enterprises* "mandates judgment for . . . plaintiffs only if they stand in a substantially identical position to Eastern Enterprises with respect to both the plurality and Justice Kennedy's concurrence."[17] *Unity Real Estate*, 178 F.3d at 659; *see also Association of Bituminous Contractors*, 156 F.3d at 1254-55.

Therefore, in order to determine whether the Massey Plaintiffs may constitutionally be subjected to liability for the Massey Assignments, we must determine what it means to be in a position "substantially identical" to that of Eastern. In so doing, we must identify and examine the factors that were critical to both the plurality and Justice Kennedy in their respective determinations that the Commissioner's assignments to Eastern were unconstitutional. The Massey Plaintiffs are only entitled to succeed here if their position, with respect to every critical factor, is substantially identical to that of Eastern. As explained below, our assessment of the plurality opinion of Justice

---

[17]We note that *Eastern Enterprises* does not stand for the legal proposition that the Eastern assignments under the Coal Act contravene the Takings Clause. As the district court properly observed, "it is clear that [a] majority of the Court [in *Eastern Enterprises*, i.e., Justice Kennedy and the four dissenters] believed that the Coal Act, and its assessment of premiums, did not constitute a taking within the ambit of the Fifth Amendment." *A.T. Massey Coal Co., Inc. v. Massanari*, 153 F. Supp. 2d 813, 825 (E.D. Va. 2001); *see also Unity Real Estate*, 178 F.3d at 659 ("[W]e are bound to follow the five-four vote against the takings claim in *Eastern*."). Nor can *Eastern* stand for the proposition that the Eastern assignments are unconstitutional under the Due Process Clause, because only Justice Kennedy arrived at such a conclusion. It is this absence of consensus on the part of the Court that prompts us to apply *Eastern Enterprises* only to coal operators that stand in a position substantially identical to that of Eastern.

O'Connor and the separate concurring opinion of Justice Kennedy leads us to conclude that a coal operator stands in a position "substantially identical" to that of Eastern if it had no connection to the 1974 or subsequent NBCWAs. *See Unity Real Estate*, 178 F.3d at 659 (observing that "[l]anguage in the plurality and the concurrence suggesting that expectations fundamentally changed after 1974" indicates that connection to 1974 and subsequent NBCWAs is a critical factor).

1.

Justice O'Connor's plurality opinion emphasized that the magnitude of Eastern's retroactive liability was severely disproportionate to the conduct giving rise to that liability. The plurality observed that, while Congress has "considerable leeway to fashion economic legislation," and that it may impose retroactive liability under certain circumstances, an economic regulation may nonetheless constitute an impermissible taking "if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of the liability is substantially disproportionate to the parties' experience." *Eastern Enters.*, 524 U.S. at 528-29. Applying that observation to Eastern, the plurality noted that it was the 1974 NBCWA that "first suggest[ed] an industry commitment to the funding of lifetime health benefits for both retirees and their family members." *Id.* at 530-31. Accordingly, "[n]ot until 1974 . . . could lifetime medical benefits under the multiemployer agreement have been viewed as promised." *Id.* at 535.

Eastern, though, had left the coal industry in 1965, and it had been party only to NBCWAs that promised unvested benefits, fully subject to later alteration and termination. *Id.* at 529-32. The plurality dismissed as irrelevant the fact that Eastern's wholly owned subsidiary, EACC, was party to the 1974 expanded benefits regime, and that EACC continued mining coal until 1987. The plurality maintained that "Eastern's liability under the Act bears no relationship to its ownership of EACC." *Id.* at 530. "[T]he Act assigns Eastern responsibility for benefits relating to miners that Eastern itself, not EACC, employed." *Id.* Because the Act grounded Eastern's liability exclusively in Eastern's own conduct, the plurality assessed the constitutionality of Eastern's liability on the same terms. Given Eastern's particular, pre-1974 experience and its expectations in the coal mining

industry, the plurality reasoned that the retroactive liability to which Eastern had been subjected was unconstitutionally disproportionate. *Id.* at 536-38.

### 2.

Justice Kennedy's separate opinion similarly relies on the fact that Eastern left the coal mining industry prior to the pivotal 1974 NBCWA. Justice Kennedy, though, emphasized the unfairness of holding Eastern retroactively liable for a benefits crisis that it had not helped to precipitate. He observed that our legal tradition has long disfavored retroactive economic legislation, because such legislation "can destroy the reasonable certainty and security which are the very objects of property ownership." *Id.* at 548 (Kennedy, J., concurring in the judgment and dissenting in part). He therefore concluded that "due process protection must be understood to incorporate our settled tradition against retroactive laws of great severity." *Id.* at 549. In defining "retroactive laws of great severity," Justice Kennedy focused on both (1) the degree of retroactive effect, i.e., how much time had passed since the conduct that gave rise to liability, and (2) whether the liability in question was remedial, in that it imposed "an actual, measurable cost of the employer's business which the employer had been able to avoid in the past." *Id.* (quotation and citation omitted).

Justice Kennedy determined that the assignments to Eastern, by creating liability for Eastern's conduct in the 1950s and 1960s, had "a retroactive effect of unprecedented scope." *Id.* at 549-50. Because such retroactive liability could be justified only if it served a remedial purpose, only those coal operators who "were responsible for [the] expectation of lifetime health benefits or for the perilous financial condition of the 1950 and 1974 benefit plans [created by the 1974 NBCWA]" could reasonably be held responsible for providing lifetime benefits. *Id.* at 550. Since Eastern had neither promised lifetime benefits nor precipitated the funding crises of the 1970s and 1980s, Justice Kennedy concluded that the Coal Act, as applied to Eastern, represented "one of those rare instances in which even [the] permissive standard [of the Due Process Clause] has been violated." *Id.*

### 3.

In sum, Eastern's pre-1974 departure from the coal industry and its status as a nonparty to the 1974 and subsequent NBCWAs were criti-

cal both to the plurality and to Justice Kennedy in their respective determinations that the Commissioner's assignments to Eastern were unconstitutional. Consequently, the Massey Plaintiffs stand in a position "substantially identical" to that of Eastern only if they neither signed nor operated under the 1974 or subsequent NBCWAs.

B.

Having assessed what it means to be in a position "substantially identical" to that of Eastern, we turn to the question of whether the Massey Plaintiffs are so situated. As explained below, we conclude that they are not.

Under *Eastern Enterprises*, a coal operator cannot be assessed Coal Act premiums if it signed and operated only under pre-1974 NBC-WAs. As such, it would initially seem that our inquiry is simply whether any of the Massey Plaintiffs signed or operated under the 1974 or subsequent NBCWAs. Because it is clear that they did not, it might appear at first glance that the experiences of the Massey Plaintiffs in the coal mining industry are "substantially identical" to those of Eastern.

Under the Coal Act, however, we are not to view the experiences of the Massey Plaintiffs in isolation; any such examination would be at odds with the Coal Act's concepts of "related persons" and "controlled groups." As discussed above, the Act provides that "[a]ny employment of a coal industry retiree in the coal industry by a signatory operator shall be treated as employment by any related persons to such operator." 26 U.S.C. § 9706(b)(1)(A). Under this provision, each member of a controlled group of corporations, such as the Massey Group, is treated for Combined Fund liability purposes as though it had employed every miner who worked for any member of the group.[18]

Looking beyond the terms of the statute, we find further evidence of Congress's plain intent to aggregate the members of a corporate family into a single entity for the purpose of assigning Combined

---

[18]The Act further emphasizes the statutory unity of the members of a controlled group by holding the members jointly and severally liable for each other's obligations under the Coal Act. 26 U.S.C. § 9704(a).

Fund liability. The Conference Committee Report stated that "because of the complex corporate structures which are often found in the coal industry, the number of entities made jointly and severally liable for a signatory operator's obligations is intentionally very broad." 138 Cong. Rec. S17604 (daily ed. Oct. 8, 1992) (Conference Committee Report). In essence, the Act recognizes that coal operators frequently reorganize their corporate structures and spin off or consolidate subsidiaries. Congress recognized that while those reorganizations alter corporate relationships, they leave the nature of a coal operator's involvement in the industry unchanged. Thus, the Coal Act looks beyond the corporate form, focusing on the collective experiences of a "controlled group" rather than on the particular experiences of ever-shifting member entities.

The Massey Plaintiffs contend that their related person status with respect to coal operators who signed the 1974 and subsequent NBC-WAs has no bearing on whether their position is "substantially identical" to that of Eastern. They observe that Eastern's wholly owned subsidiary, EACC, operated in the coal mining business during the critical post-1974 period, and that it signed the 1974 and subsequent NBCWAs. They concede that Eastern sold EACC in 1987, and that because the Coal Act determines related person status as of July 20, 1992, Eastern and EACC are not statutory "related persons." The Massey Plaintiffs assert, however, that the fact that Eastern had no statutory "related person" is irrelevant to our constitutional inquiry. The Massey Plaintiffs point out that the July 20, 1992, statutory date for the determination of related person status represents an arbitrary choice by Congress. The key point, the Plaintiffs assert, is that the corporate relationship between Eastern and EACC in the post-1974 NBCWA period was functionally the same as that between the Massey Plaintiffs and their related persons (such as Omar Mining and Big Bear) who, like EACC, signed the 1974 and subsequent NBCWAs. Accordingly, the Massey Plaintiffs maintain that their experiences in the coal mining industry are "substantially identical" to those of Eastern.

The Massey Plaintiffs overlook the fact that the *Eastern Enterprises* plurality expressly deferred to the delineation of entities that Congress chose to make in the Coal Act. The plurality acknowledged that, because Eastern sold EACC prior to July 20, 1992, "the Act

assign[ed] Eastern responsibility [only] for benefits relating to miners that Eastern itself, not EACC, employed." *Eastern Enters.*, 524 U.S. at 530. The plurality thus found that "Eastern's liability under the Act bears no relationship to its ownership of EACC." And accordingly, the plurality examined Eastern's experience in isolation. *Id.*

Just as the *Eastern* Court deferred to Congress's statutory delineation of entities under the Coal Act, this Court likewise must take the parties as the Act defines them. The Coal Act designates Eastern, by virtue of its sale of its coal mining subsidiary prior to July 20, 1992, as a discrete entity. By contrast, the Act gathers the Massey Plaintiffs together with the other members of the Massey Group for purposes of determining Combined Fund liability. Regardless of how members of the Group might prefer to be viewed, Congress has, for our purposes, effectively designated these "related persons" as a single legal entity under the Coal Act. Consequently, in evaluating whether the Massey Plaintiffs' experiences in the coal industry are substantially identical to those of Eastern, we may not artificially segregate those plaintiffs from the other members of the Massey Group. Rather, we must analyze the experiences of the Massey Group as "related persons," i.e, as a whole.

Looking thus through the lense of the Coal Act's "related persons" framework, we find that the Massey Plaintiffs are part of an entity whose experiences in the coal mining industry are not substantially identical to those of Eastern. In *Eastern Enterprises*, the Court determined that it was unconstitutional to subject a coal operator to fifty million dollars in retroactive liability when that operator had engaged exclusively in pre-1974 coal mining activities, and when it had neither assented to, nor contributed to the foundering of, the expanded, post-1974 NBCWA retirement benefits regime. Here, we face the question of whether it is constitutional to subject to substantial liability a coal operator — the Massey Group — that has carried on coal mining activity throughout the crucial post-1974 period, and that has assented to and participated in the post-1974 NBCWA regime. Unlike Eastern, several members of the Massey Group (such as Omar Mining and Big Bear) signed the 1974 and subsequent NBCWAs. Attributing the employment experiences of those signatory operators to the rest of the Massey Group — as the Coal Act's "related person" provisions require us to do — and mindful that an operator is "substantially iden-

tical" to Eastern only if its experiences in the mining industry are confined to the pre-1974 NBCWA era, we find the position of the Massey Plaintiffs easily distinguishable from that of Eastern. Because the Massey Plaintiffs do not stand in a position "substantially identical" to that of Eastern, the Commissioner's assignments of liability to the Massey Plaintiffs are not unconstitutional under *Eastern Enterprises*.

V.

For the foregoing reasons, the challenges of the Massey Plaintiffs to the Massey Assignments are without merit, and we affirm the district court.

*AFFIRMED*

NIEMEYER, Circuit Judge, concurring in part in the judgment and dissenting in part:

I would find that the assignments of liability for coal workers' pensions to A.T. Massey Coal Company, Inc., Massey Coal Services, Inc., and Peerless Eagle Coal Company are unconstitutional by virtue of the Supreme Court's holding in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998). With respect to those assignments, I would reverse. Otherwise, I concur in the judgment.